## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KEVIN HAYES,                          )
                                      )
                    Plaintiff,        )
                                      )
          v.                          )        1:21CV715
                                      )
KILOLO KIJAKAZI,                      )
Acting Commissioner of                )
Social Security,                      )
                                      )
                    Defendant.        )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Kevin Hayes, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Adult Child's Disability Benefits ("CDB") and Supplemental Security Income. (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 8 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 10, 13; see also Docket Entry 11 (Plaintiff's Memorandum); Docket Entry 14 (Defendant's Memorandum); Docket Entry 16 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

# I. PROCEDURAL HISTORY

Plaintiff applied for CDB and SSI (Tr. 257-66, 269-72),[1] alleging a disability onset date of November 2, 1997 (see Tr. 257, 269).[2] Following denial of those applications initially (Tr. 104-20, 165-68) and on reconsideration (Tr. 121-64, 175-94), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 195-98). Plaintiff, his mother, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 63-103.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 9-24.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 253-56, 1237-1239), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

---

[1] Plaintiff filed his application for CDB based upon the earnings record of his disabled father (see Tr. 92, 269). To qualify for CDB, an individual must, at the time of application, 1) remain unmarried, 2) remain a dependent of the person on whose earnings record the individual bases his CDB claim, and 3) either not have attained the age of 18 or have attained the age of 18 and remain under a disability which began before the individual attained the age of 22. See 42 U.S.C. § 402(d); 20 C.F.R. § 404.350(a)(5). The standards for demonstrating disability in a CDB claim match those of claims for Disability Insurance Benefits ("DIB") and SSI. See 42 U.S.C. § 402(d) (providing that 42 U.S.C. § 423(d) supplies applicable definition of "disability" for CDB claims); 42 U.S.C. § 423(d)(1)(A) (setting forth standard definition of "disability" for DIB claims, i.e., "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"); 42 U.S.C. § 1382c(a)(3)(A) (describing same standard of disability for SSI claims); see also Craig v. Chater, 76 F.3d 585, 589 n.1 (4th Cir. 1996) ("[DIB] provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are . . . substantively identical."(internal citations omitted)).

[2] Plaintiff later amended his onset date to September 12, 2016. (See Tr. 12, 278.)

In rendering that disability determination, the ALJ made the following findings:

1. . . . [Plaintiff] had not attained age 22 as of September 12, 2016, the [amended] alleged onset date.

2. [Plaintiff] has not engaged in substantial gainful activity since September 12, 2016, the [amended] alleged onset date.

3. [Plaintiff] has the following severe impairments: Epilepsy; Autism Spectrum Disorder (ASD); Anxiety and Obsessive-Compulsive Disorders; and Attention Deficit Hyperactivity Disorder (ADHD).

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: cannot working [sic] around dangerous, moving machinery and unprotected height and cannot climb ladders, ropes and scaffolds. [Plaintiff] has a reasoning level of two, as defined by the [Dictionary of Occupational Titles ("DOT")]. Additionally, he has the capacity to engage in simple, routine, repetitive tasks in two- hour intervals. Occasionally, [Plaintiff] can have superficial interaction with the general public and occasionally may have direct interaction with coworkers in situations during which he is not required to work in teams or in tandem with them and can have occasional, direct interaction with supervisors. He is limited to working in environments in which there is little change in its structure and can perform low stress occupations, meant to include occupations not requiring [him] to produce a specific number of quotas on a defined timeline or to do fast pace assembly line work.

. . .

3

6.    [Plaintiff] has no past relevant work.

. . .

10. Considering [Plaintiff]'s age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [he] can perform.

. . .

11. [Plaintiff] has not been under a disability, as
defined in the . . . Act, from September 12, 2016,
through the date of this decision.

(Tr. 14-23 (bold font and internal parenthetical citations
omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security
Commissioner's denial of social security benefits." Hines v.
Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope
of [the Court's] review of [such a] decision . . . is extremely
limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).
Plaintiff has not established entitlement to relief under the
extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead,
the Court "must uphold the factual findings of the ALJ if they are
supported by substantial evidence and were reached through
application of the correct legal standard." Hines, 453 F.3d at 561
(internal brackets and quotation marks omitted). "Substantial

4

evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

5

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)). "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174

6

F.3d 473, 475 n.2 (4th Cir. 1999).[3]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied."  Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled."  Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]."  Id. at 179.[4]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled.  See id. at 179-80.  However, if the

---

[3]  "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ."  Hunter, 993 F.2d at 35 (internal citations omitted).

[4]  "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations."  Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)."  Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)."  Hines, 453 F.3d at 562-63.

7

claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of non-disability on these grounds:

1) "[t]he ALJ's finding that [Plaintiff's] mental conditions d[id] not meet a listing is not supported by substantial evidence" (Docket Entry 11 at 6 (capitalization, bold font, and single-spacing omitted); see also Docket Entry 16 at 1-3); and

2) "[t]he ALJ's mental RFC is not supported by substantial evidence" (Docket Entry 11 at 11 (capitalization, bold font, and single-spacing omitted); see also Docket Entry 16 at 1-3).

---

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (See Docket Entry 14 at 6-25.)

### 1. Listings 12.06, 12.10, and 12.11

In Plaintiff's first assignment of error, he asserts that "[t]he ALJ's finding that [Plaintiff's] mental conditions d[id] not meet a listing is not supported by substantial evidence." (Docket Entry 11 at 6 (capitalization, bold font, and single-spacing omitted); see also Docket Entry 16 at 1-3.) In particular, Plaintiff maintains that his mental impairments met the requirements of Listings 12.06 ("Anxiety and obsessive-compulsive disorders"), 12.10 ("Autism spectrum disorder"), and 12.11 ("Neurodevelopmental disorders"), because "[t]he record documents serious limitations in [his] ability to complete tasks in a timely manner and ignore distractions," resulting in "'marked' limitation in concentration, persistence, or maintaining pace (CPP)." (Docket Entry 11 at 7; see also id. at 7-9 (detailing evidence Plaintiff believes supported marked limitation in CPP (citing Tr. 72, 78, 82-84, 338-1205, 1229, 1232, 1236, 1267, 1269, 1356, 1393)).) Plaintiff additionally argues that he "suffer[ed] from 'marked' limitation in adapting and managing himself," because he "ha[d] great difficulty adapting to change" (id. at 10; see also id. (describing evidence of such difficulty (citing Tr. 71, 75-76, 85, 91))), and felt "overwhelmed by simple responsibilities" (id.; see also id. at 10-11 (summarizing examples of that challenge (citing

9

Tr. 78-79, 81, 1386-87, 1555-84))). Plaintiff deems those errors

by the ALJ "harmful," because "the ALJ found that [Plaintiff] ha[d]

a 'marked' limitation in interacting with others" (id. at 11

(citing Tr. 16)) and, "[t]herefore, if the ALJ had correctly found

a marked limitation in either CPP or adapting and managing

[one]self, he would have found [Plaintiff] disabled at step 3 of

[the SEP]" (id.). Those contentions fail to warrant relief.

"Under Step 3, the [SEP] regulation states that a claimant

will be found disabled if he or she has an impairment that 'meets

or equals one of [the] listings in [A]ppendix 1 of [20 C.F.R. Pt.

404, Subpt. P] and meets the duration requirement.'" Radford v.

Colvin, 734 F.3d 288, 293 (4th Cir. 2013) (quoting 20 C.F.R.

§ 404.1520(a)(4)(iii)) (internal bracketed numbers omitted). "The

listings set out at 20 CFR [P]t. 404, [S]ubpt. P, App['x] 1, are

descriptions of various physical and mental illnesses and

abnormalities, most of which are categorized by the body system

they affect. Each impairment is defined in terms of several

specific medical signs, symptoms, or laboratory test results."

Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990) (internal footnote

and parentheticals omitted). "In order to satisfy a listing and

qualify for benefits, a person must meet all of the medical

criteria in a particular listing." Bennett, 917 F.2d at 160

(citing Zebley, 493 U.S. at 530, and 20 C.F.R. § 404.1526(a)); see

also Zebley, 493 U.S. at 530 ("An impairment that manifests only

some of th[e] criteria [in a listing], no matter how severely, does not qualify.").

The ALJ here apparently assumed without express analysis that Plaintiff's anxiety and obsessive-compulsive disorders, ASD, and ADHD met the paragraph A criteria of Listings 12.06, 12.10, and 12.11, respectively, and proceeded to analyze whether Plaintiff could meet the requirements of paragraphs B and C of those listings, ultimately concluding that he could not do so. (See Tr. 15-16.) Moreover, Plaintiff has not challenged the ALJ's determination that Plaintiff's mental impairments failed to satisfy the paragraph C criteria of Listings 12.06, 12.10, and 12.11 (see Tr. 16). (See Docket Entry 11 at 6-11.) Thus, the relevant inquiry focuses on whether substantial evidence supports the ALJ's findings with respect to the paragraph B criteria of the listings in question.

Paragraph B of Listings 12.06, 12.10, and 12.11 all require proof that the condition documented via Paragraph A resulted in at least "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

1. Understand, remember, or apply information[;]

2. Interact with others[;]

3. Concentrate, persist, or maintain pace[; and]

4. Adapt or manage oneself."

11

20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.06B, 12.10B, 12.11B (internal citations omitted) (emphasis added). In this context, to qualify as "marked," a limitation must "<u>seriously</u>" restrict the ability to function "independently, appropriately, effectively, and on a sustained basis" <u>id.</u>, § 12.00F.2.d (emphasis added); <u>see also</u> 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4) (explaining that "marked" represents the fourth-highest of five levels, below "extreme," but above "none, mild, [and] moderate"), whereas a "moderate" limitation means that the ability to function "independently, appropriately, effectively, and on a sustained basis is <u>fair</u>," <u>id.</u>, § 12.00F.2.c (emphasis added).

The ALJ here found that Plaintiff's mental symptoms caused <u>moderate</u> limitation in Plaintiff's ability to understand, remember, or apply information, maintain CPP, and adapt/manage himself, and <u>marked</u> limitation in his ability to interact with others. (<u>See</u> Tr. 15-16.) Plaintiff has raised challenges to the ALJ's findings with respect to CPP and adaptation/self-management (<u>see</u> Docket Entry 11 at 6-11), neither of which carry the day.

a. <u>CPP</u>

The ALJ provided the following analysis regarding Plaintiff's ability to maintain CPP:

> With regard to [CPP], [Plaintiff] has a moderate limitation. [Plaintiff] has complained of problems with focus, attention, and concentration. He displayed <u>some</u> difficulties with sustaining attention over time and distractibility. [Plaintiff] reported that he did not like <u>loud</u> noises and was easily distracted when external

12

> stimuli are present. He is provided accommodations in
> college such as extended test time of 1 hour, an
> isolated, distraction-reduced environment, and time and
> [a] half for exams.

(Tr. 16 (emphasis added).) Plaintiff does not specifically challenge any aspects of the ALJ's above-quoted analysis but rather highlights evidence he believes supported a marked limitation in CPP. (See Docket Entry 11 at 7-9 (citing Tr. 72, 78, 82-84, 338-1205, 1229, 1232, 1236, 1267, 1269, 1356, 1393).)

As an initial matter, by pointing to record evidence Plaintiff believes demonstrated a marked CPP limitation, he misinterprets this Court's standard of review. The Court must determine whether substantial evidence, i.e., "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted), supported the ALJ's finding of moderate limitation in CPP, and not whether other record evidence weighed against that finding, see Lanier v. Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence."). Moreover, as explained more fully below, the evidence on which Plaintiff relies would not have compelled the ALJ to find a marked CPP limitation.

Although Plaintiff points out that he "had an [IEP] throughout elemental [sic] and secondary school" and provides a blanket

13

citation to the 872-page exhibit containing his IEP documents (Docket Entry 11 at 7 (citing Tr. 338-1205)), the time during which Plaintiff's IEPs remained in effect entirely predated the relevant period in this case (see Tr. 334-1205 (covering the time period from Jan. 12, 2001, to the end of 12th grade in May 2016). Notably, although Plaintiff's IEP records in preschool, elementary school, and middle school reflected more significant behavioral problems which could have impacted Plaintiff's ability to maintain CPP, such as hyperactivity (see Tr. 359, 965-66, 1131), acting aggressively or rudely towards his peers and teachers (see Tr. 381, 417, 547, 589, 725, 727, 843, 910, 965), calling out or interrupting in class (see Tr. 405, 413, 842, 910, 978), and emotional outbursts (see Tr. 417, 588, 725, 728, 910, 965, 978, 980), those records also indicate that, as he matured, those problematic behaviors lessened substantially (see Tr. 757 (12th grade IEP documenting that Plaintiff had made great progress controlling his emotional outbursts and had not had any since 2013), 948 (6th grade IEP noting Plaintiff had "come a long way" achieving his goal of reducing his inappropriate commenting and "ha[d] almost mastered it"), and that he maintained good grades in his classes, which included Advanced Placement and college-level courses (see Tr. 788 (transcript reflecting 3.7578 weighted grade point average in 11th grade), 1051-52 (transcript documenting 3.8558 weighted grade point average and class rank of 69 out of 249

14

students in 12th grade). Accordingly, Plaintiff's IEP records would not have compelled the ALJ to find a marked limitation in CPP during the relevant time period in this case, i.e., from the amended onset date of September 12, 2016, to the date of the ALJ's decision on March 2, 2021.

Plaintiff further contends that his need for academic accommodations demonstrated a marked deficit in CPP. (See Docket Entry 11 at 7-8; see also Docket Entry 16 at 1-3.) In that regard, Plaintiff notes that, "[a]fter neurocognitive testing in 2016, it was recommended that he be afforded 24-hour extensions on homework/assignment deadlines without penalty" (Docket Entry 11 at 8 (citing Tr. 1267)) and that, "during testing[, Plaintiff] frequently asked if he could change task directions . . . and this questioning served as a source of distraction that derailed him from tasks" (id. (citing Tr. 1269)). Plaintiff additionally emphasizes that, "[d]espite accommodations of 1-hour extended test time and an isolated, distraction-free environment [at Alamance Community College], he was able to take only one class in his first semester, two classes in the following three semesters, and three classes in his final semester" (id. (citing Tr. 72, 1232, 1236)), and that he has continued to need "'[t]ime and a half' for exams and a '[d]istraction free testing space'" at University of North Carolina at Greensboro (id. (citing Tr. 1229)). According to Plaintiff, "the ALJ conceded [Plaintiff's] need for accommodations

15

of extra time and a distraction-free environment to complete academic tasks due to his CPP limitations, yet he failed to explain why such accommodation did not equate with more than moderate limitation." (Docket Entry 16 at 2.)

To begin, as the Commissioner argues (see Docket Entry 14 at 23), Plaintiff's mental health providers did not conclude that Plaintiff's mental impairments necessitated a "distraction-free" environment (Docket Entry 11 at 13), but rather, a setting with "reduced" distractions (see Tr. 1229, 1232, 1259). Beyond that overstatement, Plaintiff's argument glosses over the difference between the timed pressure of college-level examinations and the demands of a workplace. Plaintiff's specific accommodations for extra time and reduced distractions to complete college examinations, which involve the pressure of timing and significant intellectual input, do not necessarily mean that he would need the same modifications to perform any job. As a result, Plaintiff has not shown that his accommodations for college testing should have compelled the ALJ to adopt a marked limitation in Plaintiff's ability to maintain CPP while performing in an occupational setting.

Plaintiff next asserts that "[u]ncontradicted testimony further demonstrates marked limitation in CPP" (Docket Entry 11 at 8), in that "[Plaintiff] and his mother testified that [he] is seriously limited in his ability to work with noise around him,"

16

"his mother testified that . . . [he] needs to work alone in a room with the door shut" (id. (citing Tr. 78)), and Plaintiff testified that he feels "overwhelmed by time limits" (id. (citing Tr. 84)). The ALJ expressly acknowledged Plaintiff's "report[] that he did not like loud noises and was easily distracted when external stimuli [we]re present" (Tr. 19 (emphasis added) (referencing Tr. 1393)), but found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [] not entirely consistent with the medical evidence and other evidence in the record" (Tr. 18), and further supported that finding by noting the following:

> The [ALJ] acknowledges that [Plaintiff] has a longstanding history of mental health issues, neurological challenges, and has received treatment since childhood. Recent treatment notes show that [Plaintiff] is doing well in college, and he had been better able to manage his coursework. He is not missing classes, and his grades have been stable. His medications, Guanfacine and Pristiq, help with impulsivity, stress, irritability, sleep, and anxiety. These factors suggest that [Plaintiff]'s current medication regimen has adequately controlled [his] mental health complaints . . . .

(Tr. 20.) Notably, Plaintiff did not challenge the ALJ's analysis of Plaintiff's subjective symptom reporting (see Docket Entries 11, 16) and thus Plaintiff has not shown that the ALJ erred in discounting the statements of Plaintiff and his mother regarding his CPP challenges.

Furthermore, although not discussed in the same paragraph in which the ALJ analyzed Plaintiff's limitation in CPP at step three

17

of the SEP, other portions of ALJ's decision further support the ALJ's moderate CPP limitation. See Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir. 2011) (concluding that, despite ALJ's brief explanation at step three, ALJ's analysis at other steps sustained step three determination); McCartney v. Apfel, 28 F. App'x 277, 279–80 (4th Cir. 2002) (rejecting challenge to ALJ's finding for lack of sufficient detail where other discussion in decision adequately supported finding and stating "that the ALJ need only review medical evidence once in his decision"); Kiernan v. Astrue, No. 3:12CV459, 2013 WL 2323125, at *5 (E.D. Va. May 28, 2013) (unpublished) (observing that, where an "ALJ analyzes a claimant's medical evidence in one part of his decision, there is no requirement that he rehash that discussion" in other parts of his analysis). The ALJ's discussion of the opinion evidence bolsters his finding of moderate limitation in CPP. In that regard, the ALJ found "mostly persuasive" (Tr. 21) the opinions of consultative psychological examiner Janice Gilberry, M.S. (under the supervision of Shiahna Dye, Ph.D.), who opined that Plaintiff "appear[ed] able to maintain [CPP]" (Tr. 1397).[6] The ALJ additionally noted

---

[6] The ALJ's explanation of his "mostly persuasive" rating of Ms. Gilberry's opinions makes clear the ALJ did not disagree with Ms. Gilberry's opinion regarding Plaintiff's ability to maintain CPP. (Tr. 21.) Rather, the ALJ deemed Ms. Gilberry's opinion that Plaintiff would "not likely [] struggle with handling the stressors of daily life . . . a slight overestimate" of Plaintiff's functioning," and noted that "the record suggest[ed] that [Plaintiff] d[id] have some difficulty handling certain stressors when overwhelmed." (Id.)

18

findings in Plaintiff's mental health treatment records that supported the moderate limitation in CPP, such as the following:

- Plaintiff's therapist Dr. Katherine Tyson stated that she treated Plaintiff "from May 2018 to January 2019 for 15 therapy sessions" and observed that he "displayed <u>some</u> difficulties with sustaining attention over time and distractibility." (Tr. 19 (emphasis added) (referencing Tr. 1387));

- Ms. Gilberry recorded "<u>adequate</u> attention and concentration" during her consultative psychological examination of Plaintiff on March 5, 2020. (<u>Id.</u> (emphasis added) (referencing Tr. 1395));

- "In October 2020, [Plaintiff] reported [to his mental health treatment providers at MindPath] that with Pristiq, his stress had gone down[, ] it had been easier for him to manage his college classes[, h]e had not missed any classes[,] and his grades had been stable." (Tr. 20 (referencing Tr. 1560)); and

- "Through the end of 2020, [Plaintiff] reported that Pristiq was helping his symptoms[, and h]e was . . . thinking of getting a job coach." (<u>Id.</u> (referencing Tr. 1571, 1584)).

The ALJ's evaluation of the medical and opinion evidence, in addition to the ALJ's explanation at step three, provide substantial evidence to support the ALJ's moderate limitation in CPP, and Plaintiff has failed to point out record evidence that would have compelled the ALJ to adopt a marked limitation.

b. <u>Adaptation/Self-Management</u>

The ALJ assessed Plaintiff's limitation in adaptation and self-management as follows:

As for adapting and managing onself, [Plaintiff] has experienced a moderate limitation. [Plaintiff] has a <u>history</u> of emotional outbursts during which he threatened to harm himself and others and/or destroy property. He did report <u>periodic</u> stress associated with <u>school demands</u>. He can complete activities of daily living such as bathing, grooming, and preparing convenient meals without assistance. [Plaintiff] takes things literally and does not adapt to change easily. [Plaintiff]'s mother reported that she must accompany him out frequently because he is unsure if he is doing things correctly.

(Tr. 16 (emphasis added).) Plaintiff first challenges that analysis by contending that his ability to engage in "minimal" daily activities "'such as bathing, grooming, and preparing convenient meals without assistance' . . . do not constitute substantial evidence that [his] limitations [in adaptation/self-management] are only moderate." (Docket Entry 11 at 9 (quoting Tr. 16).) In Plaintiff's view, "[t]he [United States Court of Appeals for the] Fourth Circuit has made clear that the ALJ must explain why a particular activity reflects the ability to sustain full-time work." (<u>Id.</u> (citing <u>Arakas v. Commissioner, Soc. Sec. Admin.</u>, 983 F.3d 83 (4th Cir. 2020), <u>Woods v. Berryhill</u>, 888 F.3d 686, 695 (4th Cir. 2018), and <u>Brown v. Commissioner, Soc. Sec. Admin.</u>, 873 F.3d 251, 263 (4th Cir. 2017)).)

Plaintiff's reliance on <u>Woods</u>, <u>Brown</u>, and <u>Arakas</u> misses the mark. Those cases all held that, in evaluating the consistency of a claimant's subjective symptoms reports as part of the RFC assessment, the ALJ cannot "'consider the *type* of activities a claimant can perform without also considering the *extent* to which

20

she can perform them.'" <u>Arakas</u>, 983 F.3d at 99 (quoting <u>Woods</u>, 888 F.3d at 694); <u>Woods</u>, 888 F.3d at 694 (citing <u>Brown</u>, 873 F.3d at 263); <u>see also</u> <u>Brown</u>, 873 F.3d at 263.  Thus, those decisions all underscored the ALJ's failure to recognize <u>qualifications</u> the claimants placed on their ability to perform daily activities.  <u>See</u> <u>Arakas</u>, 983 F.3d at 99 (holding that ALJ "improperly disregarded [the plaintiff's] qualifying statements regarding the limited extent to which she could perform daily activities"); <u>Woods</u>, 888 F.3d at 694-95 ("[T]he ALJ noted that [the plaintiff] can maintain her personal hygiene, cook, perform light household chores, shop, socialize with family members, and attend church services on a regular basis.  But the ALJ did not consider [the plaintiff]'s statements that she cannot button her clothes, has trouble drying herself after bathing, and sometimes needs help holding a hairdryer; that she can prepare simple meals but has trouble cutting, chopping, dicing, and holding silverware or cups; it takes her all day to do laundry; she shops only for necessities, and that process takes longer than normal; when she reads to her grandchildren, they have to turn the pages because of severe pain in her hands; and that some days, she spends the entire day on the couch."); <u>Brown</u>, 873 F.3d at 263 ("The ALJ did not acknowledge the extent of th[e daily] activities as described by [the plaintiff], e.g., that he simply prepared meals in his microwave, could drive only short distances without significant discomfort, only

21

occasionally did laundry and looked at coins, and . . . had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week.").

In contrast, the ALJ here did not ignore any qualifications or limitations on Plaintiff's abilities to bathe, groom himself, and prepare simple meals. The ALJ's language that Plaintiff "can complete activities of daily living such as bathing, grooming, and preparing convenient meals without assistance" (Tr. 16) appears verbatim in Plaintiff's reported "daily activities and functioning" during Ms. Gilberry's consultative psychological examination (Tr. 1394 (capitalization and bold font omitted); see also Tr. 285 (Plaintiff's Function Report reflecting "no problem" with self-care (capitalization and bold font omitted)), 286 (same indicating Plaintiff can prepare "[s]andwiches" and "frozen microwavable food")). Moreover, step three of the SEP specifically tasked the ALJ with determining the degree to which Plaintiff's mental impairments impacted his ability to adapt and manage himself, and the regulations make clear that matters of hygiene and self-care hold relevance to that determination:

> This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: Responding to demands; adapting to changes; managing [one's] psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for [one]self independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions. These

22

examples illustrate the nature of this area of mental functioning. [The SSA] do[es] not require documentation of all of the examples.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00E.4 (emphasis added); Thus, the ALJ properly considered Plaintiff's abilities to bathe, groom himself, and prepare simple meals without assistance as one part of his adapation/self-management analysis.[7]

Plaintiff further points out the ALJ's "not[ation] that [Plaintiff] has a history of emotional outburst[s] during which he threatened to harm himself or destroy property" as evidence supporting a marked limitation in adaptation/self-management. (Docket Entry 11 at 9 (emphasis added) (citing Tr. 16).) That argument overlooks the word "history" in the ALJ's notation. (Tr. 16.) As discussed above in connection with Plaintiff's ability to maintain CPP, Plaintiff's IEP records reflect that he has a history (entirely predating the relevant period in this case) of emotional outbursts and threatening and/or aggressive behavior in preschool, elementary school, and middle school (see Tr. 359, 381, 405, 413, 417, 547, 588-89, 725, 727-28, 842-43, 910, 965-66, 978, 980, 1131), but that his high school IEP team praised his ability to control his emotions and noted the absence of such outbursts dating back to 2013 (see Tr. 757). The record similarly does not contain

_____

[7] Notably, the ALJ did not specifically rely on Plaintiff's ability to bathe, groom himself, and prepare simple meals in fashioning the mental RFC (see Tr. 20-21), i.e., Plaintiff's maximum ability to perform mental work-related abilities on a sustained basis for an eight-hour day, see 20 C.F.R. §§ 404.1545, 416.945.

23

any evidence of emotional outbursts or threatening and/or aggressive behavior by Plaintiff after high school. (See Tr. 1254-1584.)

Plaintiff additionally maintains that he "suffer[ed] from 'marked' limitation in adapting and managing himself" (Docket Entry 11 at 9), because the record shows that he "ha[d] great difficulty adapting to change" (id. at 10; see also id. (describing evidence of such difficulty (citing Tr. 71, 75-76, 85, 91))), and felt "overwhelmed by simple responsibilities" (id.; see also id. at 10-11 (summarizing examples of that challenge (citing Tr. 78-79, 81, 1386-87, 1555-84))). That argument fails for two reasons.

First, as discussed above, by summarizing evidence Plaintiff believes established a marked limitation in adaptation/self-management, he misinterprets this Court's standard of review. The Court must determine whether substantial evidence, i.e., "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted), supported the ALJ's finding of moderate limitation in that functional area, and not whether other record evidence weighed against that finding, see Lanier, 2015 WL 3622619, at *1 ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence.").

24

Second, Plaintiff largely relies on his own subjective statements, as well as those of his mother, to support his contention that the record compels a marked deficit in adaptation/self-management (see Docket Entry 11 at 10-11 (citing Tr. 71, 75-76, 78-79, 81, 85, 91)), but the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms not entirely consistent with the record evidence (see Tr. 18), and Plaintiff opted against challenging that finding (see Docket Entries 11, 16).

Additionally, the ALJ's discussion of the opinion and medical evidence supporting the RFC assessment provides further support for the ALJ's moderate limitation in adaptation/self-management. See Smith, 457 F. App'x at 328 (concluding that, despite ALJ's brief explanation at step three, ALJ's analysis at other steps sustained step three determination); McCartney, 28 F. App'x at 279-80 (rejecting challenge to ALJ's finding for lack of sufficient detail where other discussion in decision adequately supported finding and stating "that the ALJ need only review medical evidence once in his decision"); Kiernan, 2013 WL 2323125, at *5 (observing that, where an "ALJ analyzes a claimant's medical evidence in one part of his decision, there is no requirement that he rehash that discussion" in other parts of his analysis). In that regard, the ALJ deemed "mostly persuasive" (Tr. 21) the opinions of Ms. Gilberry, but found her opinion that Plaintiff would "not likely [] struggle with

25

handling the stressors of daily life . . . a slight overestimate" of Plaintiff's functioning, "as the record suggest[ed] that [Plaintiff] d[id] have some difficulty handling certain stressors when overwhelmed" (Tr. 21 (emphasis added)). The ALJ also commented that "[r]ecent treatment notes show[ed] that [Plaintiff wa]s doing well in college, [] he had been better able to manage his coursework[, h]e [wa]s not missing classes, [] his grades ha[d] been stable[, and h]is medications, Guanfacine and Pristiq, help with impulsivity, stress, irritability, sleep, and anxiety." (Tr. 20.)

In sum, although record evidence exists that could support greater limitations in CPP and adaptation/self-management, the record does not compel a finding of marked (or extreme) limitation in either functional area. See Stallworth v. Commissioner of Soc. Sec., No. 1:12CV496, 2013 WL 2253084, at *10 (S.D. Ohio May 22, 2013) (unpublished) (holding that ALJ's failure to find greater limitations fell within ALJ's "zone of choice" because supported by substantial evidence), recommendation adopted, 2013 WL 2897879 (S.D. Ohio Jun. 13, 2013) (unpublished).

### 2. Mental RFC

In Plaintiff's second and final assignment of error, he contends that "[t]he ALJ's mental RFC assessment is not supported by substantial evidence." (Docket Entry 11 at 11 (capitalization, bold font, and single-spacing omitted); see also Docket Entry 16 at

1-3.) More specifically, Plaintiff asserts that "[t]he ALJ failed to include limitations well-documented in the record [in the mental RFC] or explain why they need not [have] be[en] incorporated into [the mental ]RFC" (Docket Entry 11 at 11), such as Plaintiff's 1) need for "additional time to complete tasks" (id. at 12), 2) "marked difficulty interacting with others" (id. at 13), and 3) "need for a quiet, distraction-free environment" (id. at 14). According to Plaintiff, the ALJ's omission of such limitations from the mental RFC prejudiced him, because the VE testified that "'[a]ny extra time that is built into the work program that other employees are not getting to do the same job is going to be a modification and not competitive'" (id. at 12 (quoting Tr. 101) (emphasis omitted)), "that being off-task more than 5% of a work day would preclude competitive employment" (id. (citing Tr. 100)), and that "limiting the noise intensity level to *quiet* would preclude the marker and store laborer jobs, and limiting the noise to *very quiet* would also eliminate the hospital cleaner job" (id. at 14 (citing Tr. 98)). Plaintiff's arguments fall short.

RFC measures the <u>most</u> a claimant can do despite any physical and mental limitations. <u>See</u> <u>Hines</u>, 453 F.3d at 562; 20 C.F.R. § 404.1545(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms. <u>See</u> <u>Hines</u>, 453 F.3d at 562-63; 20 C.F.R. § 404.1545(b). The ALJ then must match the

27

claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy). See 20 C.F.R. § 404.1567. Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level. See 20 C.F.R. § 404.1569a(c).

"The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). . . . The [ALJ] must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Social Security Ruling 96-8p, Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *7 (July 2, 1996) ("SSR 96-8p"). Although the ALJ need not discuss every piece of evidence in making an RFC determination, see Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014), he or she "must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion," Woods, 888 F.3d at 694 (internal emphasis, quotation marks, and brackets omitted). Here, no basis for remand exists because, for the reasons explained more fully below, the ALJ's decision supplies the necessary "accurate and logical bridge," Woods, 888 F.3d at 694 (internal quotation marks omitted), between the evidence and his findings that Plaintiff's

28

(A) mental impairments qualified as "severe" (Tr. 15) but (B) did not cause limitations greater than those reflected in the mental RFC (<u>see</u> Tr. 17).

a.    <u>Additional Time to Complete Tasks</u>

Plaintiff contends that he "requires additional time to complete tasks" and "becomes overwhelmed and distracted when faced with time constraints." (Docket Entry 11 at 12.) According to Plaintiff, "[t]he ALJ did not dispute that [Plaintiff] need[ed] extended time to complete school tasks, yet he failed to provide any rational [sic] for not including such a limitation in the [mental ]RFC assessment." (<u>Id.</u>) Plaintiff additionally faults the ALJ for "fail[ing] to incorporate [Plaintiff's] attention deficits into the [mental ]RFC assessment" where "[t]he ALJ did not dispute that [Plaintiff wa]s easily distracted." (<u>Id.</u>)

Plaintiff's argument ignores the fact that the ALJ explicitly stated that he fashioned the mental RFC in a way that addressed Plaintiff's need for <u>academic</u> accommodations, noting that the mental RFC "[wa]s <u>consistent</u> with the accommodations [Plaintiff] receive[d] in an <u>academic</u> setting, including recommendations in the letters from Dr. [Toby B.] DeWitt." (Tr. 21 (internal parenthetical citation omitted) (emphasis added) (citing Tr. 1356-85).) Consistent with that statement, the ALJ limited Plaintiff to work that involves neither the intellectual complexity nor the pressured time demands of college tests, i.e., <u>simple, routine,</u>

29

<u>repetitive work</u> requiring no more than <u>Reasoning Development Level</u> <u>2</u> ("RDL 2"), with significantly limited social interaction, little structural change, and no production "<u>quotas on a defined timeline</u> or <u>fast pace assembly line work</u>" (Tr. 17 (emphasis added)).[8] Moreover, those restrictions and, in particular, the production-based restriction, also adequately addressed Plaintiff's moderate limitation in CPP. <u>See</u> <u>Grant v. Colvin</u>, No. 1:15CV515, 2016 WL 4007606, at *9 (M.D.N.C. July 26, 2016) (unpublished) (finding non-production restriction "facially addresse[d] moderate . . . limitation in the claimant's ability to stay on task" (internal quotation marks omitted)), <u>recommendation adopted</u>, slip op. (M.D.N.C. Sept. 21, 2016) (Osteen, Jr., C.J.).

b. <u>Marked Difficulty Interacting with Others</u>

Plaintiff next asserts that the ALJ "failed to reconcile []his finding [that Plaintiff had marked limitation in interacting with others] with the minimal limitation included in the [mental ]RFC assessment: occasional direct contact with supervisors and occasional direct contact with co-workers." (Docket Entry 11 at 13.) Plaintiff points out that, because the "SSA defines occasional as up to one-third of a workday[,] . . . the ALJ found

---

[8] The <u>DOT</u> explains that RDL 2, the second lowest level of reasoning on a descending scale of complexity from six to one, requires an individual to "[a]pply commonsense understanding to carry out <u>detailed but uninvolved</u> written or oral instructions," and to "[d]eal with problems involving a <u>few</u> concrete variables in or from <u>standardized</u> situations." <u>DOT</u>, App'x C ("Components of the Definition Trailer"), § III ("General Educational Development"), 1991 WL 688702 (emphasis added).

[Plaintiff] capable of spending up to two-thirds of the workday directly interacting with either supervisors or co-workers." (Id.) That argument fails for three reasons.

First, Plaintiff omits an important detail by describing the ALJ's mental RFC as permitting "occasional direct contact with co-workers." (Id.) In fact, the ALJ limited Plaintiff to "occasional[] . . . direct interaction with coworkers in situations during which he is not required to work in teams or in tandem with them." (Tr. 17 (emphasis added).) The ALJ's bar of teams and tandem work added a significant, qualitative restriction to the coworker interaction limitation. See Kearns v. Commissioner of Soc. Sec., No. 3:19CV1243, 2020 WL 2841707, at *12 (N.D. Ohio Feb. 3, 2020) (unpublished) (deeming "ALJ's limitation to no team or tandem tasks [] a qualitative limitation on social interaction" which "adequately addressed the [consultants'] opinion . . . that [the plaintiff] be limited to superficial interaction with others" (emphasis added)), recommendation adopted, 2020 WL 2839654 (N.D. Ohio June 1, 2020) (unpublished); Collins v. Commissioner of Soc. Sec., No. 3:17CV2059, 2018 WL 7079486, at *6 (N.D. Ohio Dec. 7, 2018) (unpublished) (noting that "the ALJ restricted [the p]laintiff from 'team or tandem tasks,'" which constituted "a restriction on the quality of interpersonal contact" (emphasis added)), recommendation adopted, 2019 WL 1409535 (N.D. Ohio Mar. 28, 2019) (unpublished).

31

Second, Plaintiff mischaracterizes the ALJ's interaction limitations in the RFC as "minimal." (Docket Entry 11 at 13.) The ALJ's limitation to occasional interaction with others (see Tr. 17), i.e., for up to only one-third of a workday, constitutes a significant quantitative limitation on interaction, while his restriction of contact with the public to "superficial" interactions and his preclusion of "teams" and "tandem" work with coworkers (id.) constitute substantial qualitative restrictions on interaction, see Alexandrowski v. Commissioner of Soc. Sec., No. 3:20CV2302, 2021 WL 8342812, at *13 (N.D. Ohio Nov. 18, 2021) (unpublished) ("[T]he ALJ's RFC finding that [the plaintiff] could . . . only occasionally respond appropriately to interactions with supervisors and coworkers, and could not work in teams or in tandem with other workers was consistent with [consultative psychological examiner]'s opinion that [the plaintiff] had 'severe significant limitations' in responding appropriately to interactions with supervisors and other workers and would 'not do well' in social responsiveness." (emphasis added)). Plaintiff simply has not shown that the ALJ's significant interaction limitations in the RFC failed to account for Plaintiff's marked limitation in interacting with others. See David N. v. Commissioner of Soc. Sec., No. 20CV85, 2021 WL 3492921, at *5 (W.D.N.Y. Aug. 9, 2021) (unpublished) ("[M]arked limitations in mental functioning . . . do not mandate a finding of disability.

Rather, such limitations may be addressed through restrictions in a plaintiff's RFC, precisely as the ALJ did here . . . by limiting [the plaintiff] to no more than occasional contact with supervisors, no more than occasional interaction with coworkers, [and] no team or tandem work." (internal quotation marks and citations omitted)); Juliana Marie M. v. Commissioner of Soc. Sec., No. 18CV1421, 2019 WL 6829044, at *10 (N.D.N.Y. Dec. 13, 2019) (unpublished) ("The fact that [the] plaintiff was found to have a marked limitation interacting with others does not conclusively demonstrate that she is unable to work, particularly given the fact that the ALJ limited plaintiff to work that does not require more than occasional interaction with the public and co-workers." (quotation marks, initial brackets, and emphasis omitted)).

Third, Plaintiff's suggestion that contemporaneous limitations to occasional interaction with supervisors and occasional interaction with coworkers necessarily entails interaction for up to two-thirds of a workday (see Docket Entry 11 at 13; see also Docket Entry 16 at 3) strains the bounds of common sense. Although the possibility exists that some of the time an individual interacts with supervisors may not coincide with the time that individual interacts with coworkers, to reach interaction for two-thirds of a workday, all of the individual's interactions with one group must occur separately and distinctly from interactions with the other group. Plaintiff cites to no authority supporting such

33

an implausible interpretation of occasional interaction limitations (see Docket Entry 11 at 13; see also Docket Entry 16 at 3), and independent research failed to uncover any such authority.

Even if the Court interpreted the ALJ's dual limitations to occasional interaction with coworkers and occasional interaction with supervisors to permit interaction for up to two-thirds of an eight-hour workday, Plaintiff still has not shown prejudicial error under the circumstances presented here. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). The DOT codes for all three of the jobs the ALJ found Plaintiff able to perform – Store Laborer, DOT No. 922.6**8**7-058 ("Laborer, Stores"), 1991 WL 688132 (G.P.O. 4th ed. rev. 1991), Hospital Cleaner, DOT No. 323.6**8**7-010 ("Cleaner, Hospital"), 1991 WL 672782, and Marker, DOT No. 209.5**8**7-034 ("Marker"), 1991 WL 671802 (see Tr. 23), contain a fifth digit, or 'People' rating, of "8," "reflecting the lowest possible level of human interaction that exists in the labor force," Fletcher v. Colvin, No. 1:15CV166, 2016 WL 915196, at *10 (M.D.N.C. Mar. 4, 2016) (unpublished), recommendation adopted, slip op. (M.D.N.C. Mar. 28, 2016) (Osteen, C.J.). Moreover, all three jobs rate the activity of "Taking Instructions – Helping" as "Not Significant" and reflect the tasks of "Talking" and "Hearing" as

34

"Not Present - Activity or condition does not exist." <u>DOT</u>, No. 922.687-058 ("Laborer, Stores"), 1991 WL 688132; <u>DOT</u>, No. 323.687-010 ("Cleaner, Hospital"), 1991 WL 672782; <u>DOT</u> No. 209.587-034 ("Marker"), 1991 WL 671802.[9]

Consequently, Plaintiff has not shown that remand for the ALJ to include greater interaction limitations in the RFC would result in a different outcome in his case. <u>See</u> <u>Ridley G. v. Commissioner of Soc. Sec.</u>, No. 1:20CV773, 2021 WL 4307507, at *8, *13 (N.D.N.Y. Sept. 22, 2021) (unpublished) (deciding that RFC restriction to <u>no</u> interaction or <u>tandem tasks</u> with coworkers harmonizes with jobs with <u>DOT</u> level 8 interaction); <u>Scott C. v. Commissioner of Soc. Sec.</u>, No. 2:20CV109, 2021 WL 2682276, at *4-5 (D. Vt. June 30, 2021) (unpublished) ("'[L]evel 8 interaction [in the <u>DOT</u>] is compatible with an RFC limiting a claimant to only <u>superficial</u> contact with coworkers, supervisors, and the public.'" (quoting <u>Alie v. Berryhill</u>, 4:16CV1352, 2017 WL 2572287, at *16 (E.D. Mo. June 14, 2017) (unpublished)) (emphasis added)); <u>Wilson v. Saul</u>, No. 1:19CV1089, 2020 WL 6293132, at *4 (M.D.N.C. Oct. 27, 2020) (unpublished) (Webster, M.J.) ("[E]ven assuming the ALJ erred here by failing to include additional social limitations in the RFC . . ., any error would be harmless because the jobs the ALJ

---

[9] The VE testified (and the ALJ found) that 336,000 of such jobs existed in the national economy (<u>see</u> Tr. 23, 95-97), which clearly represents a significant number of jobs under Fourth Circuit precedent, <u>see</u> <u>Hicks v. Califano</u>, 600 F.2d 1048, 1051 (4th Cir. 1979) ("We do not think that the approximately 110 jobs testified to by the [VE] constitute an insignificant number.").

concluded that [the p]laintiff could perform do not require significant social interactions. In fact, the [<u>DOT</u>'s] descriptions of the jobs identified by the VE list interaction with "People" as being "Not Significant."), <u>recommendation adopted</u>, slip op. (M.D.N.C. Nov. 24, 2020) (Biggs, J.); <u>Eldridge v. Berryhill</u>, No. CV 16-5289, 2018 WL 1092025, at *2 (W.D. Ark. Feb. 28, 2018) (unpublished) (finding jobs categorized by <u>DOT</u> as involving level 8 interaction consistent with restrictions to "<u>limited</u> contact with the general public" and "<u>incidental</u> contact with co-workers" (emphasis added)); <u>Shorey v. Astrue</u>, No. 1:11CV414, 2012 WL 3475790, at *6 (D. Me. July 13, 2012) (unpublished) (holding that "inclusion of a limitation to <u>occasional</u>, <u>brief</u>, and <u>superficial</u> contact with coworkers and supervisors in the [ALJ]'s hypothetical question would not have excluded" jobs with a <u>DOT</u> "People" rating of 8), <u>recommendation adopted</u>, 2012 WL 3477707 (D. Me. Aug. 14, 2012) (unpublished); <u>Flaherty v. Halter</u>, 182 F. Supp. 2d 824, 851 (D. Minn. 2001) (finding jobs with "not significant" levels of social interaction under the <u>DOT</u> compatible with ALJ's limitation to "<u>brief</u> <u>superficial</u> type of contact with co-workers and supervisors and members of the public" (emphasis added)).

c.   <u>Quiet, Distraction-Free Environment</u>

     Lastly, Plaintiff maintains that "[t]he ALJ [] erred in failing to include noise limitations in his RFC assessment." (Docket Entry 11 at 14.)  According to Plaintiff, he "has a well-

36

documented need for a quiet, distraction-free environment," because "[h]e is distracted by minimal activity or noise" and "was distracted from his studying by the noise his father was making whisking eggs a few rooms over." (Id. (citing Tr. 86).) Plaintiff notes that "[h]is providers and evaluators have consistently recommended that [Plaintiff] be isolated from others when he is working[.]" (Id. at 13 (citing Tr. 904, 1015, 1229, 1232, 1259).)

As a threshold matter (and as pointed out above in the context of Plaintiff's first assignment of error), Plaintiff's mental health providers did not opine that Plaintiff required a "distraction-free" environment for collegiate testing (id.), but rather, a setting with "reduced" distractions (see Tr. 1229, 1232, 1259). Furthermore, Plaintiff has not shown that he needed the specific academic accommodations tailored to assist him in navigating college-level examinations in order to perform work that involves neither the intellectual complexity nor the pressured time demands of college tests, i.e., simple, routine, repetitive work requiring no more than RDL 2, with significantly limited social interaction, little structural change, and no production "quotas on a defined timeline or fast pace assembly line work" (Tr. 17 (emphasis added)).[10]

---

[10] As noted by the Commissioner, Plaintiff's "college coursework included micro and macro-economics, biology, Java programming, engineering, and statistical methods." (Docket Entry 14 at 24 (citing Tr. 1236).)

37

Finally, as the Commissioner argues (see Docket Entry 14 at 25), even if the ALJ erred by failing to include a restriction to "quiet" work environments in the RFC (a limitation consistent with a requirement for a reduced-distraction environment), that error remains harmless under the facts presented here. Although the DOT rates the noise level of Store Laborer and Marker jobs as "Moderate," DOT, No. 922.687-058 ("Laborer, Stores"), 1991 WL 688132; DOT No. 209.587-034 ("Marker"), 1991 WL 671802, the DOT categorizes the Hospital Cleaner job as "Quiet," DOT, No. 323.687-010 ("Cleaner, Hospital"), 1991 WL 672782. Thus, even if ALJ had included a limitation to "quiet" work settings in the RFC, the Hospital Cleaner job would have remained available, and the VE testified that 54,500 of those jobs existed in the national economy (see Tr. 96; see also Tr. 23 (ALJ's adoption of VE's job numbers)).[11]

For all of the foregoing reasons, Plaintiff's second issue on review fails as a matter of law.

### III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for a

---

[11] Plaintiff has not shown that his mental impairments required a "very quiet" environment for the performance of the limited range of simple, routine, and repetitive tasks permitted by the ALJ's mental RFC (see Tr. 17). (See, e.g., Tr. 1393 (recording Plaintiff's statement to Ms. Gilberry that "[h]e does not like loud noises" (emphasis added))).

38

Judgment Reversing or Modifying the Decision of the Commissioner of Social Security, or Remanding the Case for a Rehearing (Docket Entry 10) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 13) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

January 3, 2023